(100 South. 438)

No. 25878.

## MILNE ASYLUM FOR DESTITUTE OR-PHAN GIRLS v. REILLY.

(March 17, 1924. Rehearing Denied by Division B May 12, 1924.)

*(Syllabus by Editorial Staff.)*

**I. Insane persons ⚖➡2—Evidence insufficient to show that girl was feeble-minded within statute.**

In suit to have girl declared feeble-minded and returned to asylum, evidence *held* to show that she had sufficient mentality to place her beyond scope of Act No. 141 of 1918, defining feeble-minded persons.

**2. Insane persons ⚖➡49—What may be urged in defense of action to have girl declared feeble-minded within statute, stated.**

In suit by orphan asylum to have girl taken from such asylum declared feeble-minded within Act No. 141 of 1918, and returned thereto, mother could urge for her as defense that which could be urged on application for her discharge had she been committed to asylum by virtue of order of court.

**3. Insane persons ⚖➡49—Home surroundings of alleged feeble-minded girl held not to require her commitment to orphan asylum.**

In suit by orphan asylum to have girl who was taken from asylum without its consent declared feeble-minded within Act No. 141 of 1918, and returned to asylum, evidence *held* to show that girl's relatives were able and willing to support her, that their home surroundings were good, and that it was not for her interest or that of the community that she be recommitted.

**4. Insane persons ⚖➡49—Power of superintendent of state school to pass on application of feeble-minded persons not delegable.**

Application for admission of girl as feeble-minded, within Act No. 141 of 1918, to orphan asylum, must be passed upon by superintendent of State Colony and Training School as required by Act No. 133 of 1920, § 1, and superintendent cannot delegate his power to an orphan asylum forming unit of the school.

Appeal from Civil District Court, Parish of Orleans; Percy Saint, Judge.

Suit by the Milne Asylum for Destitute Orphan Girls against Mrs. J. C. Reilly.

Judgment for plaintiff, and defendant appeals. Judgment set aside, and plaintiff's demand rejected.

Woodville & Woodville, of New Orleans, for appellant.

St. Clair Adams, of New Orleans, for appellee.

By Division C, composed of OVERTON, ST. PAUL, and THOMPSON, JJ.

OVERTON, J. Act No. 141 of 1918 provides for the establishment of an institution for the care and custody of those of the feeble-minded who cannot be classed as insane, and yet who are so mentally defective as to be incapable of caring for themselves and of managing their affairs, and who require supervision and control for their welfare, or for the welfare of others, or of the community. The institution is to be known as the "State Colony and Training School." The act of 1918, establishing it, has been enlarged, supplemented, and modified in certain respects by Acts 133 and 139 of 1920, though not so as to alter the purpose of the institution, but only in such respects as to make it possible to better accomplish that purpose. The board of administrators of the institution was not in position to care for feeble-minded white girls, and therefore, upon the advice of the legal department of the state, as to the legality of their action, designated, temporarily, the Milne Asylum for Destitute Orphan Girls, a body corporate, and the plaintiff herein, as a unit of the State Colony and Training School. Since then the asylum has been caring for feeble-minded white girls.

In November, 1921, Mrs. J. C. Reilly, one of the defendants herein, who by her first marriage was Mrs. Walker, made application for the admission of her daughter, Beatrice Violet Walker, then 19 years of age, to the Milne Asylum for, at least, one year and for such further time as might appear necessary in the opinion of those in charge of the institution. The basis of the application was that Miss Walker was feeble-minded. Later, a formal application was made for her admission, and she was then examined, mentally and physically; and, as a result of the mental and other examinations made, Miss Walker was admitted to the asylum, as a ward of the state.

In July, 1922, J. C. Reilly, the stepfather of Miss Walker, while visiting her at the asylum, took her to his home, without the consent of the institution, and he and Mrs. Reilly have refused to return her. As a result, this suit followed.

Plaintiff alleges in its petition that Miss Walker is feeble-minded, and although 20 years of age, possesses the mentality of a child of about 8 years; that due to her mental infirmities, she is incapable of properly caring for herself and of governing her actions and conduct; and that her stepfather and her mother are unable to properly supervise, control, care for, and support her. The petition also sets forth the facts stated in the foregoing part of this opinion, and alleges that the court should appoint two physicians, or one physician and a psychologist, in conformity with section 14 of Act 141 of 1918, to hear evidence and to examine into Miss Walker's condition, and to make report thereon. The petition then concludes with a prayer to the effect that there be judgment decreeing that Miss Walker is feeble-minded, and as such subject to be dealt with under the legislative acts heretofore mentioned, and directing that she be sent to the plaintiff institution; the decree prayed for to be binding on all concerned until it is rescinded, superseded, or set aside.

After excepting to the suit, Miss Walker, her stepfather, and her mother filed an answer, in which they aver that they, with Miss Walker's brother, are living under the same roof; that the parents and the brother

of Miss Walker are devoted to her, and contribute to her well-being in every way. They further aver that Miss Walker's surroundings are congenial and proper, and should not be disturbed. In other respects, save as to a plea that Act 141 of 1918, under which the suit is brought, is unconstitutional, the answer is virtually a general denial.

The judge a quo, after overruling the exception that was filed, appointed a physician and a psychologist to examine the mental capacity of Miss Walker, and to hear with the court the evidence to be adduced on the trial, and to make their report as provided by section 2 of Act 139 of 1920. The experts appointed sat with the judge, made their examination, and their report. The judge, after considering the evidence and the report of the experts, rendered judgment decreeing Miss Walker to be feeble-minded within the purview of Act 141 of 1918, and ordering her sent to the Milne Asylum for Destitute Orphan Girls, an institution duly licensed to receive the feeble-minded.

### Opinion.

Section 2 of Act 141 of 1918 defines the term "feeble-minded," as used in the act, as follows:

"The words 'feeble minded' in this act shall be construed to mean any person afflicted with mental defectiveness from birth or from an early age, so pronounced that he is incapable of managing himself and his affairs, or being taught to do so, and requires supervision, control and care for his own welfare, or for the welfare of others, or for the welfare of the community, who is not classifiable as an insane person within the meaning and intent of the laws of the state of Louisiana."

The question is presented whether Miss Walker is a feeble-minded person within the purview of the definition quoted, or of the act from which it is taken. The question is one largely of fact. After a careful consideration of the evidence in the record, the briefs filed, and the arguments made, we have reached the conclusion that, while the young lady is below the average in mentality, she is not feeble-minded within the purview of the foregoing definition, or the act from which it is quoted. Were we to consider alone the opinions of the experts who have testified in the case and who have made reports on Miss Walker's mental condition, a different conclusion would be reached by us; but we are not to consider those opinions and reports alone. While they command our respect and most justly have received our consideration, yet it is our duty to consider the evidence as a whole in deciding the issue. So considering it, we have reached the conclusion stated above.

While no attempt will be made in this opinion to review and discuss the evidence fully, yet we feel that we should call attention to some of it that has influenced us in reaching a conclusion. In the first place, attention may be called to the fact that Miss Walker, prior to the time of her admission to the Milne Asylum, applied for and obtained employment in business establishments. She worked as press feeder in a printing house, and held the position for over a year. At the expiration of that time, she occupied the same position in another establishment, holding it for at least a year. She also worked at two other places for short periods. At the time she quit, she was earning $15 a week, and quit because of ill health.

While the work performed by Miss Walker, in holding these positions, may have been simple, yet the fact that she did hold them for the periods stated, and was able to command, towards the close of her work, a salary of $15 a week, tends strongly to show that she is not without sufficient capacity to care for herself, and that the welfare of others, or of the community, does not demand that she be subjected to the provisions of Act 141 of 1918.

In determining the intellectual capacity of one alleged to be feeble-minded, the alleged feeble-mindedness being caused by a defect dating from birth or from an early age, as provided in the statute, it is important to consider the progress that such person made at school, when it appears that he or she has attended school. In this instance, Miss Walker attended the public schools of this city for approximately six years. At the time she quit she was in the fifth grade. While the progress made by her during that time does not reach the average, yet we think it sufficient to tend strongly to show that she has enough intellectual capacity to manage her own affairs within the purview of Act 141 of 1918, and especially do we so think, when it is considered that during the period of her attendance at school her health was not always good, which, doubtless, interfered to some extent with her progress.

In determining whether one is feeble-minded, it is also important, we think, to analyze the evidence of the person alleged to be in that condition; this for the purpose of ascertaining the degree of comprehension of the witness, shown by her answers to the questions propounded, and of gauging her mentality, as far as possible, in other respects. Miss Walker took the witness stand. It may be observed, at the outset, that the English used by her was good, a grammatical error seldom occurring, and when one did, it was only a slight one. Her evidence occupies seven pages of the transcript. The answers given by her to the questions propounded are clear and responsive. In no instance was it necessary to repeat a question or to put it in different form. As a fair illustration of the comprehension displayed by her in answering questions, we quote the following from her examination in chief:

"Q. You have tried to help your mother by working when she needed it, did you not, years ago?
"A. Yes, sir; I did.

"Q. What kind of work did you do?
"A. I fed the presses.
"Q. For whom?
"A. For the James Buckley Company.
"Q. Anybody else?
"A. Mr. Sendker.
"Q. Anybody else?
"A. Mr. Thiberge.
"Q. What school did you go to?
"A. McDonough No. 14.
"Q. On Peters avenue?
"A. Yes, sir; on Peters avenue.
"Q. How long did you go there?
"A. I went there about six years.
"Q. Are you able to read?
"A. Yes, sir.
"Q. Can you tell the judge of some of the things you read now?
"A. Well, magazines and Saturday Evening Post, and the Ladies' Home Journal, and little story books, and everything like that.
"Q. Why did you have to leave school?
"A. My father was in very bad health, and I had to help my mother.
"Q. Has your mother ever neglected your welfare in any manner?
"A. No, sir.
"Q. Has your stepfather ever neglected your welfare in any manner?
"A. No, sir."

On cross-examination Miss Walker was interrogated with reference to what she had read; and the following question, among others, was propounded to her, and was answered as follows:

"Can you tell me what the story was you read? Take your time and tell the judge exactly what that story was about.
"A. It tells how a young girl and a young man met each other, and this young man asked this young lady would she be his wife, and she said she would. Then it tells how they got married, and tells how they lived with each other, and how mean her husband was, and how he treated her, and afterwards they separated, and then later on they wanted to go back to each other, and she didn't want to go back to him, because he treated her so mean. She said she didn't want to go back. So he didn't go back to her, or she didn't go back to him, rather, because he treated her so mean; and she had one little child. She said she was going back to him for the child's sake, but she felt if she would go back he would abuse her and treat the child mean, so she decided she would not go back. Then after-

wards, she met him on the street, and he tried to force her to go back, and she told him no, because once he treated her mean he would do it always. He promised her with his own two lips he would do better, and she said no, she did not want to go back, because it would be the same thing, and he said, 'All right.' So the young man got so desperate that she would not go back to him, that he said the only way he could do was to end his life. So he went and committed suicide and took his own life because she would not go back to him, and that was the last I can remember."

A copy of the story narrated is not before us. The witness, however, insists that she read such a story, names its author, and the journal in which she says it was published. While, therefore, because of the fact that the story is not in the record, we are unable to say whether it has been correctly told, yet it is not for that purpose that we quote it, but for the purpose of showing that the witness is capable of narrating a story clearly and intelligently, and for the further purpose of showing the capacity of the witness for sustained thought, and hence as a circumstance tending to show that the witness has sufficient mental capacity to place her beyond the scope of Act 141 of 1918.

[1] Our conclusion is, in view of the foregoing facts, and in view of the evidence as a whole, that. Miss Walker has sufficient mentality to place her beyond the scope of the act of 1918.

Assuming, however, that we have erred in reaching the conclusion we have, it does not follow necessarily that Miss Walker must be sent to the State Colony and Training School, or, in other words, to the Milne Asylum as a unit of that colony, or as an institution duly licensed to receive weak-minded persons. In considering this phase of the case, it should be observed that plaintiff's demand, properly speaking, is not that Miss Walker be returned to the asylum because of the application made by her mother for her admission therein and accepted by it, al-

though the application is set out in full in plaintiff's petition, but that she be decreed to be feeble-minded within the purview of Act 141 of 1918 and ordered sent to the institution conducted by plaintiff. Section 4 of Act 139 of 1920 authorizes any person committed by an order of court to the State Colony and Training School to petition the court that entered the order for his or her discharge. One of the grounds upon which the court is authorized to grant the discharge is:

"Because the relatives or friends of the feeble-minded person are able and willing to supervise, control, care for and support him and request his discharge."

[2] Miss Walker has not been admitted to the State Colony and Training School or to the Milne Asylum, as a unit of that colony, by virtue of an order of court. However, as such an order has been requested, may her mother not urge for her, as a defense, that which could be urged on application for Miss Walker's discharge were she at present committed by virtue of an order of court? We conclude that she may.

The evidence, touching this phase of the case, discloses that Miss Walker's mother owns the home in which the family resides, though the evidence shows that the property has not been paid for in full. Miss Walker's stepfather and her brother are laboring men. They are able and willing to care for and support her, and Miss Walker's mother is able, we think, and is willing, to control, guard, and protect her daughter. The young lady has a separate room in her mother's home, and is contented and happy in the family circle. The moral conditions surrounding her are good. With reference to the home, the experts appointed by the judge, after making an examination, reported as follows:

"The home of Violet Walker's parents was visited and examined. The house and premises were clean and well kept. All reasonable

comforts were provided. The neighborhood is good. The whole ménage represents thrift and domestic activity."

[3] Our conclusion is that, even if we have erred by holding that Violet Walker has sufficient mental capacity to place her beyond the scope of Act 141 of 1918, still she should not be sent to an institution for the feeble-minded. The law does not require that she be sent to one, as her relatives are able and willing to care for, support, and protect her, and her welfare and that of the community do not demand such action.

[4] In a preceding paragraph we said that plaintiff's demand, properly speaking, was not that Miss Walker be returned to the asylum because of the fact that she was taken away from there, after her mother had made application for her admission, and the application had been accepted by the asylum, but that the demand is that Miss Walker be decreed to be feeble-minded within the purview of Act 141 of 1918, and sent to the asylum. Let us assume, however, that plaintiff's demand includes a prayer that the young lady be returned to the asylum under the application made by her mother and accepted by that institution; still we should not feel justified in ordering her return thereunder. Aside from the fact that we feel that it was an error to have placed her in an institution for the feeble-minded, it does not appear that Miss Walker was admitted therein as provided by law, and hence the admission cannot be given the effect necessary to order her return. Section 1 of Act 133 of 1920 provides for the admission of the feeble-minded to the State Colony and Training School, without an order of court, upon the application of certain designated persons and officials. The section intrusts the power to determine whether the person, whose admission is applied for, is feeble-minded or not, within the purview of Act 141 of 1918, to the superintendent of the State Colony and Training School, who is permitted to ex-ercise the power only after certain examinations are made. If the person whose admission is applied for is received by the superintendent, then, in the words of the statute, "the said person then and there by this act of the superintendent becomes a ward of the state," and, as provided by the section, may be discharged only in the manner prescribed by the statute, which is by order of court. The application, in this instance, for the admission of Miss Walker, is addressed to the Alexander Milne Home School for Girls. It does not appear to have been acted on by the superintendent of the State Colony and Training School. The evidence justifies the inference that it was not so accepted, but was passed upon and accepted only by the Milne Home. The power to pass upon applications made under section 1 of Act 133 of 1920, the section under consideration, is not such a power as may be delegated by the superintendent of the State Colony and Training School, or by the board of directors thereof, to another, but must be exercised by the superintendent, to whom it is intrusted by the lawmaker.

For the reasons assigned, the judgment appealed from is annulled and set aside, and plaintiff's demand rejected, at its costs.

Rehearing refused by Division B, composed of DAWKINS, LAND, and LECHE, JJ.